# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PLAINVILLE ELECTRICAL PRODUCTS
COMPANY, INC.,
      Plaintiff,

      v.

VULCAN ADVANCED MOBILE POWER
SYSTEMS, LLC,
      Defendants.

CIVIL ACTION NO.
3:09cv447 (SRU)

## RULING ON MOTION TO DISMISS

Plainville Electrical Products Company, Inc. ("PEPCO") sued Vulcan Advanced Mobile

Power Systems, LLC ("Vulcan AMPS"), along with Vulcan Power Group, LLC ("VPG" or

"Vulcan Power"), Vulcan Capital Management, Inc. ("VCM" or "Vulcan Capital"), and three

individual officers of the Vulcan entities.[1]  Under a 2005 arbitration award, Vulcan AMPS is

liable to PEPCO in the amount of $314,925.59 plus interest pursuant to an earlier contract

between those two parties.  PEPCO claims that all the defendants are liable for numerous torts

sounding in fraud, including RICO violations, and that I should pierce the Vulcan AMPS

corporate veil and hold the other defendants responsible for the moneys owed to PEPCO.  The

defendants other than Vulcan AMPS (collectively, the "moving defendants") moved to dismiss

PEPCO's claims against them.

---

[1] Vulcan AMPS and VPG are both organized under Delaware law, have offices in North
Carolina, and their principal place of business in New York.  VPG is a holding company that
holds the assets of several Vulcan companies.  VCM is a Delaware corporation with its principal
place of business in New York.  VCM provides private equity investment to the other Vulcan
entities and subsidiaries.  The individual defendants are: Ford Graham, the managing director of
VCM and the president of Vulcan AMPS and VPG; Kevin Davis, the chairman of Vulcan
AMPS, VPG, and VCM; and Grover Scott Campbell, the treasurer of Vulcan AMPS and Vulcan
Power.  In addition to those defendants, Gerald L. Campbell is an officer of Vulcan AMPS and
VPG, and Charles Foster Valeria Ramundo Orlando is an officer of VCM.

On July 16, 2009, I heard argument on the moving defendants' motion to dismiss.  From the bench, I granted the motion to dismiss PEPCO's veil piercing claim without prejudice as to Vulcan Power and with prejudice as to the other moving defendants; I granted the motion to dismiss PEPCO's fraudulent transfer, third-party beneficiary, fraud and CUTPA claims with prejudice.  In addition, I denied the motion to dismiss PEPCO's unjust enrichment claim as to Vulcan Power, granted the motion to dismiss PEPCO's unjust enrichment claim without prejudice with regard to the other moving defendants, and granted PEPCO leave to plead a fraudulent concealment claim against Vulcan AMPS.  I reserved judgment on the motion to dismiss PEPCO's RICO claim.  For the reasons that follow, that motion (**doc. # 24**) is GRANTED.

I.      **Background**

For the purposes of the moving defendants' motion to dismiss, I accept the facts pleaded in PEPCO's amended complaint as true.  Accordingly, unless indicated otherwise, the facts discussed herein are taken from that complaint (hereinafter, "the complaint" and cited to as "Compl.").

On October 17, 2003, Vulcan AMPS entered into a purchase order with Washington Group International Inc. ("Washington Group"), pursuant to which Vulcan AMPS would supply two generators to Washington Group and incorporate them into a power plant in Bayji, Iraq. Vulcan was to deliver those two generators on or about the weeks of November 21, 2003 and December 12, 2003.  The Washington Group agreed to pay Vulcan AMPS $14,481,000 per generator, or a total of $28,962,000.  On October 17, 2003, Washington Group paid Vulcan

AMPS and/or Vulcan Power a $4,000,000 deposit.[2]  On October 31, 2003, Washington Group paid Vulcan Power $9,145,500 for each generator, or a total of $18,291,000.

On or about December 4, 2003, Vulcan AMPS informed Washington Group that the second generator would not be delivered on time.  On or about December 13, Washington Group terminated its purchase order with respect to that second generator; on or about December 19, 2003, Washington group demanded payment from Vulcan AMPS for monies previously paid for that second generator in the amount of $7,778,550.  On or about May 3, 2004, Washington Group brought an arbitration claim against Vulcan AMPS to recover that amount.

On May 18, 2004, Ford Graham represented by e-mail to PEPCO's agents that PEPCO would be paid for work performed in Iraq.  Two days later, on May 20, 2004, Vulcan AMPS and PEPCO entered into a contract wherein Vulcan AMPS agreed to pay PEPCO for its expertise and onsite engineering assistance to install and commission an electrical power plant in Bayji.  That contract provided that it superseded "all prior written and oral agreements and understandings between Parties with respect to the subject matter of this Agreement."  5/20/04 Contract (Att. as Ex. A to Obj. to Mot. Dismiss).  Vulcan AMPS agreed to pay PEPCO $2,200 per day for its work in Iraq; Vulcan AMPS provided invoices to the Washington Group indicating that PEPCO performed $393,600 worth of work.

On September 3, 2004, Grover Scott Campbell represented to PEPCO that PEPCO would be paid for work performed pursuant to the purchase order with Washington Group.  One week later, on September 10, Grover Scott Campbell sent another email to PEPCO representing that

---

[2] The complaint does not specify to which Vulcan entity, Vulcan AMPS or Vulcan Power, Washington Group paid the $4,000,000 deposit.  Compl. at ¶ 27.

PEPCO would be paid.

On or about December 22, 2004, Grover Scott Campbell mailed a certification to the Washington Group that all vendors, including PEPCO, had been paid.  He also mailed invoices to the Washington Group in an attempt to receive payment for the work performed by PEPCO and instructed Washington Group to provide payment to a Vulcan Power bank account.

On May 27, 2005, Vulcan AMPS and Washington Group settled the arbitration claim that Washington Group filed against Vulcan AMPS.  The settlement provided that Vulcan AMPS was not required to reimburse Washington Group, because Vulcan AMPS claimed it had undertaken additional work and incurred additional expenses in performing work pursuant to the purchase order.  That contention was based in part on invoices submitted for work that PEPCO performed for Vulcan AMPS as a subcontractor.  As part of the settlement with Washington Group, Vulcan AMPS warranted that "it has paid all of its subcontractors, suppliers and/or vendors any undisputed amounts due and owing to them from Vulcan and hereby agrees to release, indemnify, and hold harmless [Washington Group] from any claim or demand against [Washington Group] that any such subcontractor, supplier and/or vendor has or may in the future institute with respect to the Purchase Order."  Settlement Agreement at p. 2 (Att. as Ex. C to Obj. to Mot. Dismiss).  PEPCO alleges that, in reliance upon those representations, PEPCO continued to perform under the contract between it and Vulcan AMPS.  Compl. at ¶ 107.  As I ruled at oral argument, any claim based on PEPCO's reliance on Vulcan AMPS's settlement agreement with Washington Group must fail, because (1) there is no plausible allegation that PEPCO knew of the settlement agreement, and (2) PEPCO could not have reasonably relied on Vulcan AMPS's representation that it had already paid any undisputed amounts due.  Even if PEPCO knew about

Vulcan AMPS's representation to Washington Group, it also knew that it had not been paid by Vulcan AMPS, and could not have reasonably relied on a representation to the contrary.

Vulcan AMPS did not pay PEPCO all amounts due, and on March 22, 2006, PEPCO brought an arbitration action against Vulcan AMPS.  On February 12, 2007, an arbitration award in the amount of $314,925.59 issued against Vulcan AMPS.  That award stated in part that "Vulcan [AMPS] did not refuse to pay PEPCO as an act of bad faith and that their reasons for nonpayment provide genuine and colorable defenses."[3]  2/12/07 Arbitration Award at p. 5 (Att. as Ex. B to Obj. to Mot. Dismiss).  On April 5, 2007, a stipulated judgment against Vulcan AMPS entered in Connecticut Superior Court in the amount of $314,925.59 with interest accruing on that sum at the Connecticut post-judgment interest rate from February 12, 2007.

In September 2007, defendants Grover Scott Campbell and Kevin Davis had an interstate phone conversation concerning Vulcan AMPS's outstanding debt to PEPCO.

On or about March 21, 2008, PEPCO commenced an arbitration action against the defendants in this action as well as Gerald L. Campbell, seeking to hold the moving defendants and Gerald Campbell liable for the Vulcan AMPS judgment.  After certain defendants moved to enjoin that arbitration action, the parties agreed that PEPCO would withdraw its arbitration action, and that if PEPCO commenced an action by February 26, 2009 "asserting the same claims based on the same facts" as those alleged in the arbitration, such claims would be deemed timely

---

[3] PEPCO contends that Vulcan AMPS did not raise any dispute about the work performed by PEPCO or its responsibility to compensate PEPCO for that work at any time prior to the arbitration between PEPCO and Vulcan AMPS.  Also, according to PEPCO, "[a]t the arbitration, the Vulcan AMPS claims were either fraudulent or frivolous, PEPCO did not have evidence or even information about Vulcan AMPS' actions," and "the arbitrator's decision was flawed as he did not have information as to Vulcan AMPS and its principals' representations to [Washington Group] and the government."  Obj. to Mot. Dismiss at p. 4.

to the extent that they would have been timely as of March 21, 2008 based on the facts alleged in the arbitration.  PEPCO did not raise RICO claims in that arbitration.  On February 26, 2009, PEPCO filed this action in state court, and the defendants timely removed the action.

Vulcan AMPS has not paid PEPCO, and lacks sufficient capital to do so.  PEPCO now contends that "The Vulcan entities, Ford Graham, Kevin Davis and Grover Scott Campbell established the various corporate entities as part of a plan designed to use this purported corporate structure to create a 'shell game' to defraud its [sic] customers, vendors and creditors." Compl. at 46.

## II.   Discussion

### A.   Standard of Review for Failure to State a Claim Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

B.    PEPCO's RICO Claim

PEPCO alleges that the defendants were participants in an enterprise, have engaged and continue to engage in a scheme to obtain and retain money for work performed by PEPCO, and that the alleged scheme included interstate phone calls and mailings.  Compl. at ¶¶ 116-18.  The moving defendants argue that PEPCO fails to adequately allege predicate acts of mail or wire fraud, an open-ended or closed-ended continuous pattern of racketeering activity as required to state a claim under RICO, or a claim under any sub-section of the RICO statute.

"To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'"  *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (quoting *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 101 F.3d 900, 904 (2d Cir. 1996)).

To satisfy the first element of a RICO claim – that is, to establish a substantive RICO violation – a plaintiff must show a "pattern of racketeering activity."  18 U.S.C. § 1962(a)-(c). "To survive a motion to dismiss, this pattern must be adequately alleged in the complaint." *Spool v. World Child International Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  Where, as here, a plaintiff alleges a RICO violation based on predicate acts of mail and/or wire fraud, it must plead two or more predicate acts of mail or wire fraud that are "related, and [either] amount to or pose a threat of continuing criminal activity."  *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999).  "The latter so-called 'continuity' requirement can be satisfied either by showing a 'closed-ended' pattern – a series of related predicate acts extending over a substantial period of time – or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the

-7-

predicate acts were performed." *Spool*, 520 F.3d at 183.

          1.    *Alleged Predicate Acts of Mail Fraud and Wire Fraud*

PEPCO alleges nine predicate acts of mail fraud and/or wire fraud in furtherance of the defendants' alleged scheme to defraud. "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). In order to successfully plead mail or wire fraud, PEPCO must specify the circumstances constituting the alleged fraud with particularity. *Id*. at 634; Fed. R. Civ. P. 9(b). "[A]llegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). For an instance of alleged fraud to satisfy PEPCO's burden at the pleading stage, then, it must be sufficiently particular.

The complaint states that "[i]n furtherance of the scheme to defraud, the defendants did the following:"

    a.    On May 18, 2004, Ford Graham represented by e-mail to Joseph Nalley and Robert Sposato of PEPCO that PEPCO would be paid for the work performed in Iraq and requested PEPCO to send an employee to Iraq to commence work.

    b.    On or about December 22, 2004, Grover Scott Campbell mailed invoices from North Carolina to Washington Group in New Jersey in an attempt [to] receive payment for work performed by PEPCO.

    c.    On December 22, 2004, Grover Scott Campbell mailed a certification from North Carolina to the Washington Group in New Jersey that represented that all PEPCO invoices were paid or would be paid in full by Vulcan in an attempt to receive payment for work performed by PEPCO.

     d.      On or about December 22, 2004, Grover Scott Campbell mailed invoices from Vulcan AMPS that provided instructions for the Washington Group to wire payment for the invoices for the work performed by PEPCO to a Vulcan Power bank account in North Carolina.

     e.      On May 27, 2005, Ford Graham signed a settlement agreement with the Washington Group and warranted that it had paid or would pay all of its subcontractors or suppliers and/or vendors any undisputed amounts due and owing to them from Vulcan even though PEPCO was not paid all amounts due in order to obtain payment from the Washington Group.

     f.      On various other unspecified dates in 2004, Grover Scott Campbell represented in interstate phone conversations with Joseph Nalley of PEPCO that it would be paid for the work performed.

     g.      On September 3, 2004, Grover Scott Campbell sent an interstate email representing to Joseph Nalley, an employee of PEPCO, that PEPCO would be paid for the work performed pursuant to the purchase order with the Washington Group.

     h.      On September 10, 2004, Grover Scott Campbell sent an interstate e-mail representing to Joseph Nalley that it would be paid for the work performed pursuant to the purchase order with the Washington Group.

     i.      In September of 2007, Grover Scott Campbell and Kevin Davis had an interstate phone conversation discussing the outstanding debt owed to PEPCO.

Compl. at ¶ 119.  Those allegations raise a number of concerns with regard to the adequacy of PEPCO's pleading of each alleged predicate act, as well as whether PEPCO has sufficiently pleaded a closed- or open-ended pattern of continuing criminal activity.

          a.      Whether PEPCO has pleaded predicate acts with adequate particularity

As discussed above, PEPCO is required to state the contents of allegedly fraudulent communications, who was involved in those communications, where and when the communications took place, and PEPCO must also explain why each communication was fraudulent.  With regard to allegations (a) through (d) and (f) through (h), PEPCO has done so.

Each allegation indicates who from the defendants communicated with either Washington Group or PEPCO, the contents of the communication (in each instance, a representation to either Washington Group or PEPCO that PEPCO would be paid for work performed), the date of the communication at issue and the locations of the individuals involved.[4]  Read in conjunction with the complaint as a whole, it is also clear why each communication was fraudulent – neither Vulcan AMPS nor any other defendant had paid PEPCO nor, according to the complaint, did any defendant plan to pay PEPCO for work done under PEPCO's contract with Vulcan AMPS.

With regard to allegation (e), the complaint does not indicate how or whether interstate wires or mails were used in to commit either mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343.  PEPCO indicates the date of the communication (May 27, 2005), the parties to the communication (Ford Graham and the Washington Group), and the content of the communication (a settlement agreement).  PEPCO also indicates why the settlement agreement was fraudulent, i.e., Vulcan AMPS falsely represented to the Washington Group that it had paid all subcontractors (implicitly including PEPCO) all amounts due.  PEPCO does not, however, indicate where and how the communication took place, including whether any interstate mail or phone call was involved.  If, for instance, Graham (on behalf of Vulcan AMPS) entered into a

---

[4] With regard to allegations (b), (c), and (d), it is not clear whether each alleges a separate mailing by Grover Scott Campbell (on his behalf or on behalf of Vulcan AMPS) in North Carolina to the Washington Group in New Jersey.  Because, as discussed herein, allegations (f), (g), and (h) also concern fraudulent statements by Grover Scott Campbell, PEPCO has nevertheless alleged more than one predicate act of mail and/or wire fraud by Grover Scott Campbell.

Although PEPCO does not identify the "various other unspecified dates in 2004" in allegation (f) on which Grover Scott Campbell represented to Nalley that PEPCO would be paid, because as discussed below PEPCO's RICO claim fails on other grounds, I do not reach the question of whether allegation (f) pleads fraud with adequate particularity under Rule 9(b).

settlement agreement with Washington Group and the parties executed that agreement in person, a false or fraudulent statement contained in the agreement would not constitute a predicate act of mail or wire fraud without use of interstate mail or wires.

Finally, with regard to allegation (i), there is no particular detail indicating the locations of the individuals on the alleged phone call (other than that the call was interstate in nature). More importantly, neither does PEPCO's allegation indicate the content of the communication or why it was fraudulent. Even if Campbell and Davis discussed the debt that Vulcan AMPS owed to PEPCO, they may have been doing so in a routine discussion of Vulcan AMPS's outstanding debts. PEPCO has not alleged that Campbell and Davis discussed avoiding paying PEPCO, or that whatever communication took place in 2007 in any way furthered a scheme to defraud PEPCO.

Because allegation (e) does not indicate use of interstate mail or wires so as to adequately plead a predicate act of mail or wire fraud, and because allegation (i) does not indicate why the communication at issue was fraudulent, those allegations cannot serve as predicate acts in support of PEPCO's RICO claim.

The remaining allegations of mail and wire fraud cover a time period beginning May 18, 2004 and continuing through to, at the latest, December 31, 2004.[5] As discussed above, for those acts to adequately support allegations of a continuing pattern of criminal activity, PEPCO must sufficiently plead either "closed-ended" continuity or "open-ended" continuity.

b.      Closed-ended continuity

---

[5] Because PEPCO alleged phone calls from Campbell "[o]n various other dates in 2004," I will consider December 31, 2004 to be the latest date any of those calls could have been made. Alternately, the latest incident of mail or wire fraud as alleged took place on December 22, 2004.

"To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.' " *Cofacrèdit*, 187 F.3d at 242 (quoting *H.J. Inc v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989)).  As the Second Circuit explained in *Spool*, "the relevant period, . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 F.3d at 184; *see also Cofacrèdit*, 187 F.3d at 243.  The Second Circuit, like a number of other circuits, has "never held a period of less than two years to constitute a 'substantial period of time.'" *Id*; *Cofacrèdit*, 187 F.3d at 242; *see also GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 468 (2d Cir. 1995) (collecting cases from Third, Fourth, Sixth, Seventh and Ninth Circuits).  Although the court of appeals "ha[s] not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where, . . . [t]he activities alleged involved only a handful of participants and do not involve a  complex, multi-faceted conspiracy."  *Spool*, 520 F.3d at 184 (internal quotation marks and citations omitted).

PEPCO does not allege a complex, multi-faceted conspiracy; instead, PEPCO alleges that on less than ten occasions, three individuals (perhaps on behalf of three corporations) made false statements regarding forthcoming payment under a contract.  Accordingly, there is no reason to consider a period of less than two years during which RICO predicate activity occurred as sufficient to establish closed-ended continuity.  Here, the predicate acts that were adequately alleged span the period from May 18, 2004 to (at latest) December 31, 2004, or less than eight months.  Even if the May 27, 2005 settlement agreement could constitute a predicate act under RICO, PEPCO's allegations would still only suggest a period of predicate activity that lasted just

over a year.  Accordingly, PEPCO's allegations fail to state a claim based on closed-ended RICO continuity.

> c.      Open-ended continuity

To satisfy open-ended continuity, a plaintiff "must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 243.  "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful"; when "the enterprise primarily conducts a legitimate business, however, no presumption of a continued threat arises."  *Spool*, 520 F.3d at 185 (quoting *Cofacrèdit*, 187 F.3d at 242-43) (internal quotation marks omitted).  PEPCO cannot escape the legitimate business activity in which the defendants were engaged, and instead compel treatment of the defendants' formal and informal business activities as "inherently unlawful," simply by alleging that the defendants only worked together in a scheme to defraud PEPCO.  As the *Spool* court wrote:

> The plaintiffs cannot avoid this determination [that defendants' enterprise was primarily legitimate] by . . . separating the alleged RICO enterprise from . . . previously legitimate business.  The RICO statute defines an "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." . . . The enterprise can be any ongoing organization, formal or informal, that functions as a continuing unit.

420 F.3d at 185-86 (internal citations and punctuation omitted).  The amended complaint clearly alleges that the various defendants were each part of whatever enterprise existed.  Compl. at ¶ 116 ("The Vulcan entities, Ford Graham, Kevin Davis and Grover Scott Campbell were participants in an enterprise.").  Here, because the defendants' business activities, including entering into contracts for, providing financing for, and ensuring the proper function of

generators in Iraq, their business was and is primarily and inherently lawful.

In order for PEPCO to adequately allege open-ended continuity, it must plead facts that would suggest a threat of continuing criminal activity beyond December 31, 2004 (or, arguably, May 27, 2005), when the last predicate act may have occurred. The threat of continuing criminal activity moving forward cannot concern nonpayment to PEPCO for work done under PEPCO's contract with Vulcan AMPS, because PEPCO's work was complete and payment to Vulcan AMPS or Vulcan Power for that work was complete. The alleged scheme to obtain PEPCO's work without payment was therefore "inherently terminable." *Cofacrèdit*, 187 F.3d at 244 ("[A]n 'inherently terminable' scheme does not imply a threat of continued racketeering activity."); *GICC Capital Corp.*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot."). Although the threat of future incidents of mail or wire fraud could suggest open-ended continuity, PEPCO has not pled any facts that indicate a threat of future misrepresentations by any defendant to PEPCO regarding payment for work done.

PEPCO asserts that five other lawsuits support its arguments in favor of open-ended continuity. According to PEPCO, those five suits adequately establish that the Vulcan and individual defendants have engaged in illegal conduct in the past, and threaten to do so again in the future. Although the cited lawsuits are not mentioned in the complaint, they could be included as allegations in an amended complaint, and therefore relate to the question whether PEPCO should be permitted to further amend its complaint or whether a dismissal of the present complaint should be with prejudice. Each lawsuit that PEPCO identifies in an effort to suggest a threat of future wrongdoing and establish open-ended continuity was brought by a different

-14-

plaintiff and none involves PEPCO.  Those lawsuits are:

- *Adams v. Vulcan Energy Solutions, LLC, et al.*, Case No. 3:07cv310 (N.D. Fla.): the plaintiff raised allegations of breach of contract and breach of a settlement agreement. The action culminated in a default judgment against the defendants.

- *Flannigan v. Vulcan Capital Management, Inc., et al.*, Case No. 05cv7404 (S.D.N.Y.): the plaintiff brought claims of breach of contract, violation of New York labor laws, and violation of a Delaware labor law.  The parties settled their disputes on the eve of trial.

- *Norwest Corp. v. Vulcan Capital Management, Inc.*, Case No. 06cv6342 (S.D.N.Y.): the plaintiff alleged breach of contract, quantum meruit, unjust enrichment, and account stated.  Those claims were resolved by a private arbitrator.

- *BGT Group, Inc. v. Vulcan Capital Management, Inc., et al*, Case No. 0704393CA (Fla. Cir. Ct.): the plaintiff brought claims of breach of contract, unjust enrichment, conversion, accounting, tortious interference, fraudulent inducement, civil conspiracy, and replevin.  Notably, BGT's fraudulent inducement claim alleges that Vulcan Capital misrepresented its ability to fabricate three "trailer systems."  The matter is still pending.

- *Vulcan AMPS, LLC, et al. v. O'Hare, et al.*, Case No. 06cv108-BR (E.D.N.C.): the defendants brought counterclaims and third-party claims against, inter alia, Vulcan AMPS, Vulcan Capital, Vulcan Power, Davis, and Graham alleging, inter alia, breach of contract, fraud, negligent misrepresentation, tortious interference, breach of fiduciary duty, conversion, and unjust enrichment.  Litigation concerned internecine conflicts between current and former members of certain Vulcan entities regarding the business relationship between the parties, management of the Vulcan entities, and the use of certain funds by Vulcan entities.[6] That matter has been transferred to, and is now pending in, the Western District of Texas.

According to PEPCO, those five cases filed against Vulcan entities establish that "[t]he Defendants have consistently used the corporate structure as a way to defraud creditors.  The Defendants regularly enter into contracts with one Vulcan entity, transfer assets out of the company, breach the contract and then attempt to hide behind the corporate shield."  Obj. to Mot. Dismiss at 42.  Throughout the cases that PEPCO references, however, the only claims of fraud

---

[6] The plaintiffs are: TDF, a former 50% member of Vulcan Power (along with Vulcan Capital), of which Grover Scott Campbell was a member,

are: (1) in the *BGT* case, that Vulcan Capital misrepresented its ability to fabricate trailer systems, and (2) in the *O'Hare* case, that current members and managers of various Vulcan entities misrepresented their intentions and ability to settle what amounted to internal disputes. The only allegation of fraud that touches on alleged misrepresentations concerning a defendant's ability to perform under a contract in the face of insolvency is the *O'Hare* allegation.  PEPCO has cited no authority, and I am not aware of any, indicating that an unresolved claim in a separate and distinct legal action can provide the basis for a finding of open-ended continuity in a RICO action.

Because the defendants conducted an inherently legitimate business enterprise, because the complaint does not suggest a threat of criminal activity beginning with the incidents of mail and wire fraud alleged in the complaint and continuing into the future, and because the various lawsuits against the defendants that PEPCO discusses do not indicate an open-ended pattern of criminal conduct, PEPCO fails to allege open-ended continuity.  Because PEPCO has failed to allege either closed- or open-ended continuity, PEPCO's RICO claim necessarily fails.  *Spool*, 520 F.3d at 184-85.

At its root, PEPCO seeks to enforce a money judgment against Vulcan AMPS.  That judgment is based on Vulcan AMPS's contractual obligation to PEPCO; in other words, PEPCO essentially seeks to collect from Vulcan AMPS pursuant to the contract the parties entered into. Notably, "[w]hen a simple attempt to collect an unpaid debt is dressed up as a 'RICO' action, it inures to no one's benefit but those who hold the legal profession in low esteem."  *Prichard v. 164 Ludlow Corp.*, 390 F. Supp. 2d 408, 409 (S.D.N.Y. 2005).

**III.    Conclusion**

For the reasons discussed above, PEPCO's RICO claim fails entirely.  The moving

defendants' motion to dismiss PEPCO's RICO claim (**doc. #24**) is granted with prejudice.

It is so ordered.

Dated at Bridgeport, Connecticut, this 28th day of July 2009.

_____/s/_____
                    Stefan R. Underhill
                    United States District Judge